## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

DR. SABINA BURTON,
        Plaintiff,

v.                            Case No: 14-CV-274

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
DR. THOMAS CAYWOOD,
DR. ELIZABETH THROOP and
DR. MICHAEL DALECKI,
        Defendants.

## SECOND AMENDED COMPLAINT

NOW COMES the Plaintiff, Dr. Sabina Burton, by her attorneys Hawks Quindel, S.C., and as and for a second amended complaint against the Defendants denominated above states as follows:

## I.    JURISDICTION AND VENUE

1.    This is a civil action alleging that Defendants deprived Plaintiff of her rights under 42 U.S.C. § 2000e et seq. (Title VII), 20 U.S.C. § 1681 (Title IX), 29 U.S.C. § 206(d) (Equal Pay Act) the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

2.    This Court has jurisdiction over this action, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.    The Western District of Wisconsin is the proper venue for this

action, pursuant to U.S.C. § 1391(b), in that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## II.   ADMINISTRATIVE PREREQUISITES

4.      Plaintiff has complied with all administrative prerequisites to suit under Title VII.  She filed a timely charge of sex discrimination and retaliation with the Wisconsin Department of Workforce Development and the U.S. Equal Employment Opportunities Commission on August 13, 2013 and she received a Notice of Right to Sue on February 26, 2014. Plaintiff filed an additional charge of sex discrimination and retaliation against Defendants with the U.S. Equal Employment Opportunities Commission on December 5, 2014 (443-2015-0090), a supplemental statement with the EEOC on July 21, 2015, and she received a Notice of Right to Sue on July 31, 2015.

## III.   PARTIES

5.      Plaintiff Dr. Sabina Burton is an adult resident of the State of Wisconsin currently residing at 5768 Maple Glen Lane, Platteville, Wisconsin 53818. At all times relevant to the complaint, Plaintiff was employed as a professor in the Department of Criminal Justice (Department) at the University of Wisconsin-Platteville.

6.      Defendant Board of Regents of the University of Wisconsin System (the Board) is an institution of higher education and an agency of the State of Wisconsin, established under Wis. Stat. Ch. 36, with its principal place of business

2

at 1860 Van Hise Hall, 1220 Linden Drive, in the City of Madison, Dane County, Wisconsin 53706. The Board is the governing body for University of Wisconsin system schools including UW-Platteville. Upon information and belief, the Board is an employer within the meaning of Title VII and a recipient of federal financial assistance within the meaning of Title IX.

7.      Defendant Dr. Thomas Caywood is an adult resident of the State of Wisconsin, whose current business address is One University Plaza, Platteville, Wisconsin 53818. Defendant Dr. Caywood has at all times relevant to this complaint been employed as a professor of the Department at UW-Platteville and was chair of the Department until late August, 2013. All actions alleged in this complaint to have been taken by defendant Dr. Caywood were taken under color of state law within the meaning of 42 U.S.C. § 1983 and while carrying out his duties as a public officer or employee and within the scope of his employment by the Board. Defendant Dr. Caywood is being sued in this matter in his individual capacity.

8.      Defendant Dr. Elizabeth Throop is an adult resident of the State of Wisconsin whose current business address One University Plaza, Platteville, Wisconsin 53818. Defendant Dr. Throop has at all times relevant to this complaint been employed as the Dean of the College of Liberal Arts and Education (LA&E) at UW-Platteville. All actions alleged in this complaint to have been taken by defendant Dr. Throop were taken under color of state law within the meaning of 42

3

U.S.C. § 1983 and while carrying out her duties as a public officer or employee and within the scope of her employment by the Board. Defendant Dr. Throop is being sued in this matter in her individual capacity.

9.      Defendant Dr. Michael Dalecki is an adult resident of the State of Wisconsin whose current business address is One University Plaza, Platteville, Wisconsin 53818.

10.      Defendant Dr. Dalecki at all times relevant to this complaint has been employed as a professor in the Sociology Department prior to August of 2013 and as interim director of the Department of Criminal Justice between August of 2013 and June 30, 2015, at UW-Platteville.

11.      All actions alleged in this complaint to have been taken by defendant Dr. Dalecki were taken under color of state law within the meaning of 42 U.S.C. § 1983 and while carrying out his duties as a public officer or employee and within the scope of his employment by the Board. Defendant Dr. Dalecki is being sued in this matter in his individual capacity.

## IV.      FACTUAL ALLEGATIONS

## A.      Defendants' Sex Discriminatory Employment Practices

12.      Plaintiff has been employed by the Department at UW-Platteville since August 2009. She was initially hired as an Assistant Professor and, effective August 12, 2012, she was promoted to the position of Associate Professor. She was awarded tenure effective August 20, 2013.

4

13.     Throughout Plaintiff's employment at UW-Platteville, the Chair of her Department, Defendant Dr. Thomas Caywood, treated Plaintiff less favorably than similarly situated male colleagues, e.g., Aric Dutelle and Dr. Lorne Gibson, with respect to, among other things, promotional opportunities, salary, performance evaluations, release time, course assignments, office assignments, prestigious committee appointments and other career advancement opportunities.

14.     Dr. Caywood allowed Dutelle to write his own job advertisement for his tenure track position in forensic investigation, contrary to the Faculty Constitution and Bylaws, thereby assuring he would be awarded the position. Dutelle was also awarded two years towards tenure and has been paid a higher salary than Plaintiff, even though her qualifications are superior.

15.     Plaintiff has a Ph.D. in Social Ecology from the University of California, Irvine, Department of Criminology, Law & Society and a M.A. degree in Political Science from the University of Munich, Germany. She worked and taught at the Regional Police Academy of Los Angeles County and she was the first woman accepted into Federal Law Enforcement in Germany. She worked in intelligence (counter-terrorism, counter-intelligence) and is trained in forensic psychology and offender profiling. She taught for 12 years at UC Irvine, before relocating to the Midwest.

16.     Dutelle has a one-year online Master of Forensic Science degree from National University in California. He was a police officer and crime scene

technician for the Loveland Police Department in Colorado for five years and has worked part-time in patrol for the Grant County Sheriff's Department in Wisconsin.

17.     Dr. Caywood has made exceptions for Dutelle which have allowed him to "double-dip," getting paid by the University and also pursuing jobs for the Department of Defense, which took him overseas during regular semester while his students were given online assignments instead of classroom sessions during his paid absence. In contrast, Plaintiff taught five courses, advised two graduate seminar papers and supervised multiple unpaid directed undergraduate studies, but was paid less than Dutelle.

18.     Dr. Caywood has told Plaintiff that a woman's salary is secondary to a man's salary.

19.     Dr. Caywood gave Dutelle lucrative opportunities, for example, 50% release time for being the forensic investigations coordinator and funds for an LTE to work directly for Dutelle so he could pursue other income opportunities.

20.     The Defendant Board has paid Plaintiff substantially less in base pay than her male colleagues, including without limitation Aric Dutelle and Dr. Lorne Gibson, for equal work the performance of which required equal skill, effort and responsibility and was performed under similar working conditions. Plaintiff was paid less even though her credentials and qualifications are superior to Dutelle's.

21.     The Defendant Board paid Dutelle nearly double the amount Plaintiff made in pay over base salary in the school year 2011-2012.

6

22.     Dr. Caywood and the Board applied a more rigorous standard to Plaintiff than to Dutelle and Gibson, in Department Review Board (DRB) evaluations, consistently ranking them better than Plaintiff where her performance was as good as or better than their performance.

23.     Dutelle was given credit in his DRB evaluations for his paid involvement in summer high school forensic camp, as well as his outreach to high schools for prospective students, for which he received paid release time from Dr. Caywood. Despite being paid Dutelle was rated "outstanding" in university and community service whereas Plaintiff, who volunteered numerous unpaid hours in various service projects, was ranked lower in both categories.

24.     Dr. Gibson was ranked "average" for community service in his first and second year DRB evaluations, even though he had nothing listed in this category. In contrast, Plaintiff was also ranked "average" in her first and second year DRB evaluation even though she had listed three volunteer community service activities.

25.     Plaintiff was ranked "normal" in university service, although she was a member of two prestigious university committees (one being the graduate council) and four committees in her second year. Dutelle received "outstanding" with similar to less service in those two years.

26.     Plaintiff was ranked "above average" for teaching effectiveness and student evaluations in her first year and second year DRB evaluation, even though her student evaluations added up to over 4.2, which is considered "outstanding." In

7

contrast, Dutelle and Dr. Gibson received ratings of "outstanding" with similar student evaluations.

27.    Dr. Caywood threatened to retaliate against Plaintiff in her DRB evaluations if she supported a female colleague's bid for a tenure track position in the Department.

28.    Dr. Caywood has tried to block Plaintiff's advancement in the Department, while promoting the advancement of less qualified male faculty.

29.    Dutelle was promoted to associate professor in August 2012, even though he did not meet the minimum eligibility criteria for promotion under University Rank, Tenure and Salary Procedures, which state that, "The candidate must have demonstrated significant achievement in teaching effectiveness, scholarly and professional activities and university service and also must . . . [have] a master's degree in an appropriate discipline plus at least 10 years of documented effective teaching at the college level."

30.    Dutelle had only eight years teaching experience at the college level and, thus, was ineligible for promotion.

31.    In contrast, Plaintiff's promotion to associate professor was first denied on DRB level for the purported reason that there was insufficient documentation of her teaching and then further delayed. Plaintiff had 16 years teaching experience at the college level. Her personnel and DRB file contained teaching evaluations dating

back to 1996 and three letters of support naming her as one of the most efficient and flexible instructors at UC-Irvine.

32.     Dr. Caywood supported Dutelle's application for tenure misleadingly informing the College's Rank, Salary and Tenure committee that his one-year online master's degree was a terminal degree for purposes of tenure. In contrast, Dr. Caywood initially opposed Plaintiff's bid for tenure and even lobbied against her. He later withdrew his opposition, stating it "was not worth the fight."

33.     Dr. Caywood has provided Dutelle with numerous opportunities to advance his career that have not been provided to Plaintiff.

34.     For example, Dutelle received release time to attract prospective students to the forensic investigation program that allowed him to teach fewer courses and devote University-paid time to writing and advertising his books. Dutelle was allowed to use the forensics program assistant, Kim Sargent, to do research for his book and type part of his book.

35.     Plaintiff was awarded a sabbatical as part of a Federal Diversity Research Award (FDRA), which required that the school release her from all duties so she could devote full time to her research. However, while Plaintiff was on sabbatical during spring semester 2012, Dr. Caywood called on her to advise over 60 students.

36.     Dr. Caywood also called on Plaintiff to develop a Short Study Abroad Program to Germany so students could explore the German criminal justice system.

9

The preparation for the study abroad trip was very time consuming and put Plaintiff in a difficult position with her FDRA grant.

37.     Although Plaintiff worked several months putting the program together, including securing German state subsidized food and lodging for the students, Dr. Caywood did nothing to advertise the event scheduled for June 2013, or assist Plaintiff in any way.

38.     Dr. Caywood favored Dutelle on search and screen assignments, appointing Dutelle to chair five search and screen committees, two in forensic investigation and three in criminal justice, even though two of the positions were for Ph.D. candidates in criminal justice. In contrast, Plaintiff has been assigned only one chair position even though she requested the assignment multiple times.

39.     Dr. Caywood ignored Plaintiff's requests for a window office while three junior male members of the department had window offices that were much nicer than Plaintiff's office. Plaintiff was assigned the least desirable office in the Department.

40.     Dr. Caywood ignored a doctor's note requesting an office with natural lighting for Dr. Burton in October 2012, after she suffered a painful and obvious eye-inflammation for six months. On May 15, 2013, Dr. Burton's office lighting was measured to be six candles below office space lighting standards. Plaintiff who had 20/20 vision all her life now requires reading glasses.

41.    Other female faculty and academic staff had previously complained about sex discrimination and/or sexual harassment by Dr. Caywood but the Board and its directly responsible managerial agents failed to take any effective action to address or correct his behavior.

42.    Plaintiff also protested Dr. Caywood's discriminatory treatment of her to Dean Throop and the Human Resources Director, Jeanne Durr, as described below, but they too turned a blind eye to her complaints and allowed the discrimination, as well as retaliation, to escalate.

**B.    Retaliation and Continuing Sex Discrimination**

43.    On October 10, 2012, a student contacted Plaintiff about a sexual harassment complaint against a male professor. The student told Plaintiff that the professor had given her an inappropriate note during one of her classes. The note stated, "Call me tonight!! 642-0020" – which was the professor's private cell phone number. The student was very upset and felt violated.

44.    The professor's behavior was improper and violated UW-Platteville's sexual harassment policy. Plaintiff reported the incident to Dean Throop and, following Dr. Throop's advice, she also reported the matter to Dr. Caywood and to the Dean of Students.

45.    Defendant Dr. Caywood became angry, demanding to know the student's name and why Plaintiff had not reported the incident first and only to him. He criticized Plaintiff's handling of the complaint and he made excuses for the

professor's behavior.

46.     Plaintiff reported Dr. Caywood's intimidation to Durr, as well as to Dean Throop. Durr sent Dr. Caywood an email stating that "Sabina acted quite appropriately" and that they did not want there to be any perception of retaliation and warned him that he was to "cease further communication" regarding the student complaint. Dr. Caywood, however, continued to bully and intimidate Plaintiff.

47.     At a department meeting held on November 15, 2012, Dr. Caywood told everyone present that student complaints were to be brought to his attention immediately. He had also drafted and distributed a new policy to that effect, which was contrary to UW-Platteville guidelines.

48.     Dr. Caywood scoffed that "someone," whom everyone knew was Plaintiff, had "made a big deal out of a student complaint and before notifying him took it all the way to the provost," thereby falsifying and condemning Plaintiff's actions openly and isolating and humiliating her in front of her colleagues.

49.     Plaintiff complained again to Durr on November 17, 2012 about Dr. Caywood's continued bullying and harassment over her involvement in the student's complaint and asked for an official investigation, but Durr failed to take any action and his retaliatory behavior escalated.

50.     In early December 2012, Plaintiff asked Dr. Caywood if she could chair the new search and screen committee to fill Professor Lomax's vacated position, but Dr. Caywood told her that he had given the chair position to Dutelle, contrary to an

12

earlier promise he had made.

51.     Plaintiff had been given a search and screen to chair at the start of the fall semester, but the two fall searches were then consolidated into one committee and Dr. Caywood asked Plaintiff to relinquish her chair position to Dr. Gibson, so he could build his DRB file.

52.     Dr. Caywood stated that Plaintiff would still be the "token woman" on the search committee. He also promised Plaintiff that she would get the next chair position.

53.     In reliance on Dr. Caywood's promise, Plaintiff agreed to relinquish her chair position even though she had been working at UW-Platteville since August 2009, and had chaired only one search and screen and also needed to build her DRB file.

54.     The Lomax position was Dutelle's fourth opportunity to chair a search and screen. He also had less seniority than Plaintiff and was less qualified to oversee the search.

55.     Plaintiff reminded Dr. Caywood of his promise and asked why he had given the search and screen chair position to Dutelle and his only response was that Dutelle "has law enforcement and investigative experiences. Seems a logical choice to me."

56.     Dutelle was not the logical choice for chair. The position required a Ph.D. or an ABD and Plaintiff had a Ph.D., whereas Dutelle had only a one-year online Master's degree. Plaintiff was also qualified to teach in both criminal justice

13

and forensic investigation, whereas Dutelle was only qualified in forensic investigation.

57.     In fact, Plaintiff had a very strong background in law enforcement and investigation and had previously taught law enforcement and investigation related topics at the university and policy academy level.

58.     On December 10, 2012, Plaintiff sent an email to Dean Throop complaining that Dr. Caywood was still retaliating against her for her participation in the student's sexual harassment complaint. She cited as examples his hostile attitude toward her, his negative comments about her participation in the student complaint during a recent department meeting and his decision to assign Dutelle to chair the search and screen for the position vacated by Professor Lomax when he had previously agreed to assign her the next chair position.

59.     Plaintiff also complained to Dr. Throop about sex discrimination, specifically, that Dr. Caywood showed favoritism toward Dutelle with respect to career opportunities and advancement in the department and that other faculty/staff had told her that Dr. Caywood does not give women the same consideration as men.

60.     Dr. Caywood's decision to appoint Dutelle to chair the search and screen for Lomax's vacant position was in fact retaliatory and discriminatory.

61.     Plaintiff asked Dean Throop for assistance in addressing the retaliation and discrimination by Dr. Caywood, but Dr. Throop refused, stating that it was "an internal department issue" and she did not want to "interfere in faculty

governance matters" and thereafter the retaliation and discrimination continued to escalate.

62.     On or about January 24, 2013, Dr. Caywood, without any warning, withdrew his support for Plaintiff's proposal to develop a cyber-crime program at UW-Platteville, thereby substantially damaging her career and reputation.

63.     In a letter to Plaintiff, which Dr. Caywood also copied to Dean Throop, Dr. Caywood wrote, "I'm not aware that the CJ Department approved a cyber-security program or the development of one . . . You are advertising in press releases and websites that the department and university are supportive of what you are doing. That is in error. First, you need to garner support of the cj faculty . . . I would caution you on how you are presenting your ideas and visions in the media or on the world wide web as that of the Criminal Justice department or the University of Wisconsin-Platteville."

64.     Dr. Caywood's letter came only days before Plaintiff was to formally accept a ceremonial $7,000 grant check from AT&T and right before AT&T was to issue a press release announcing the grant award. The actual grant money, which was intended to develop a cyber-security program at UW-Platteville, was already in the UW-Platteville Foundation's account. Dr. Caywood and Provost Nimocks Den Herder posed for the photo of the grant check presentation that was used in the press release.

65.     The allegations in Dr. Caywood's letter were false. Dr. Caywood wrote the letter for the sole and illegal purpose of discriminating against Plaintiff and

15

retaliating against her for her involvement in the student complaint.

66.     Prior to the student complaint Plaintiff had had numerous meetings with Dr. Caywood and other faculty, as well as with representatives from the Wisconsin Department of Justice (DOJ), in which her proposal for the development of a cyber-crime program at UW-Platteville had been discussed and positively endorsed by Dr. Caywood and others.

67.     Prior to Plaintiff's involvement in the student complaint, Dr. Caywood had guaranteed institutional support for a grant proposal she had prepared and submitted to the National Science Foundation (NSF) for development of a cyber-crime program. Although not accepted, the proposal received positive reviews and Plaintiff was encouraged by Dr. Caywood and others to prepare another NSF grant application and/or to look for other funding sources.

68.     On or about September 12, 2012, Plaintiff obtained funding from AT&T and emailed Dr. Caywood stating, "I just secured between $5000-$7000 in donations/funding from AT&T for getting a cybercrime program started in our CJ department." UW-Platteville Foundation and UW-Platteville Sponsored Programs assisted in the writing of the grant proposal.

69.     Dr. Caywood's January 24, 2013 letter to Plaintiff was intended to and did turn the Dean against Plaintiff. Without even asking Plaintiff about Dr. Caywood's false allegations, Dr. Throop sent an email to AT&T officials stating, "The press release concerns me deeply. There are a number of highly inaccurate – indeed, misleading – statements regarding the status of cyber-security curricula at

the University of Wisconsin-Platteville. I am not confident that the ceremony being planned is wise given this."

70.     Dr. Throop's email wrongly implied that Plaintiff had misled AT&T about the University's support for her cyber-crime program, thereby destroying her good name and reputation with the company.

71.     Dr. Throop's email substantially damaged Plaintiff's career by, among other things, precluding Plaintiff from utilizing the AT&T grant money for its intended purpose and foreclosing any further funding opportunities with AT&T.

72.     On January 24, 2013, Plaintiff asked Dr. Caywood via email what he would like her to do with the AT&T grant money, explaining, "This donation does not benefit me financially and actually creates extra unpaid work for me that I am willing to do for the benefit of our great school and students. If you are withdrawing your support please do so in writing so I know what to tell AT&T about this check presentation. If you have withdrawn your support for the course development we should not accept the grant." Dr. Caywood, however, did not reply to her question, putting Plaintiff in a very difficult situation.

73.     On January 26, 2013, Plaintiff asked Dean Throop what she was allowed to say at the AT&T presentation and what she could use the grant money for. Dean Throop responded, "I think you would be absolutely fine saying a few words (not a speech) thanking AT&T for their generosity and that you look forward to using these funds to explore the subject of cyber-crime further." She further wrote, "I would say that you could use the funds for conference travel, research

17

expenses, and professional development so that you perhaps will be able to publish in this area in the future."

74.     Dean Throop's instructions conflicted with the intent of the donation, which was "To support a new Cyber Security program that will educate Criminal Justice students on how to effectively investigate and respond to the increase in cyber-crime activity."

75.     On January 29, 2013, Plaintiff met with Dean Throop and Durr about Dr. Caywood's letter and harsh treatment. Plaintiff asked about the University's grievance process, but she did not get a clear answer from them on how to proceed.

76.     On February 7, 2013, Plaintiff met with Durr again to discuss how to handle the hostile work situation with Caywood, explaining that he was refusing to respond to any of the questions or emails. Durr told Plaintiff, "Tom does not have to respond to your questions" and that she would address concerns with Dr. Caywood.

77.     Again, Plaintiff asked Durr how to go about filing a grievance, but Durr did not answer her question and instead recommended that Plaintiff engage in mediation with Dr. Caywood. But Dr. Caywood refused to mediate with Plaintiff and even ignored Durr's emails.

78.     On or about March 13, 2013, Plaintiff filed a grievance with the College's Complaints and Grievances Commission.

79.     On March 14, 2013, Plaintiff submitted a request to Dr. Caywood to teach either cyber-crime or domestic terrorism. Students had repeatedly requested the courses and Plaintiff had received a FDRA grant from the UW-System for

homegrown terrorism research in spring 2012, and had been working to develop a cyber-crime/cyber-security course.

80.     Dr. Caywood denied this request and informed Plaintiff that she would be teaching 2000 and 3000 level courses.

81.     On March 18, 2013, Plaintiff submitted to Dr. Caywood a formal request to develop a graduate course in cyber-crime along with a draft course syllabus that was approved by the Criminal Justice Graduate Studies Director, Dr. Cheryl Fuller. Dr. Caywood returned it with multiple changes in red and a note to Fuller stating, "If she [plaintiff] chooses not to make changes I will not sign off on this. This looks like a bare bones proposal."

82.     On March 20, 2013, Dr. Caywood sent Plaintiff a message stating, "I spoke to David Van Buren about your proposal. As it is, he didn't think it would be approved. That's why I sent it back to you." This allegation was untrue. Van Buren, Dean of Graduate Students, wrote Plaintiff stating, "I'm sorry if there has been any miscommunication regarding my discussion with Tom [Dr. Caywood]. I didn't tell him that I thought the course wouldn't be approved. In fact, I said that I thought the topics in the course description looked fine."

83.     Since her involvement in the student complaint, Dr. Caywood unreasonably demanded that Plaintiff obtain full Department approval for all of her activities in developing a cyber-crime program, including offering a graduate course on cyber-crime, whereas none of Dutelle's initiatives in forensic investigation, including course development, donations and material orders, have gone to a

Department vote since Plaintiff joined the Department in 2009. Similarly, Dr. Gibson's NSF proposal on police integrity did not require an official Department vote.

84.     A Criminal Justice Department curriculum committee was not in place until May of 2013. Nonetheless, Dr. Caywood required Plaintiff to get approval from the Criminal Justice Department, although the Department review committee did not exist at that time.

85.     After her involvement in the student complaint, Dr. Caywood assigned Plaintiff only lower-level courses to teach, while less qualified instructors were assigned higher-level courses.

86.     Since her involvement in the student complaint, Dr. Caywood treated Plaintiff in a condescending and demeaning manner and refused to answer her questions and/or respond to her emails and refused to recognize her achievements, including bringing a restorative justice program on campus, being interviewed by KCRG News, bringing prospective students on campus, doing PACCE projects, obtaining grants and supervising undergraduate research and presentations.

87.     All of the adverse actions described in paragraphs 43 through 86, above, were undertaken by Dr. Caywood and other managerial agents of the Board because of Plaintiff's sex and/or because she had opposed sex discrimination in the workplace and/or because of her participation in a student complaint of sexual harassment.

88.     On April 19, 2013, the Complaints and Grievances Commission issued

a decision finding that "there is evidence for the appearance of favoritism towards one of Dr. Burton's male colleagues . . . [and] lack of support for Dr. Burton, especially in the chair's serious mishandling of the student complaint and in his lack of oversight and miscommunication concerning the AT&T grant proposal and the development of a cyber-security program."

89.    On July 10, 2013, after consultation with UW-System legal counsel, the Commission issued an amended decision finding that Dr. Caywood's last minute withdrawal of support for Plaintiff's cyber-crime program was unreasonable and caused harm to Plaintiff's reputation, but also erroneously finding there was insufficient evidence of sex discrimination.

90.    The Commission also recommended that "some action be taken to remedy the harm done to Dr. Burton's professional reputation."

91.    Although the Chancellor accepted the Commission's findings on July 26, 2013, UW-Platteville has yet to take any action to remedy the injury done to Plaintiff's reputation.

92.    On July 10, 2013, Dean Throop sent an email to faculty and academic staff misleadingly stating that Dr. Caywood had made a decision to "step away" from his position as chair of the Department, when he in fact had been asked to relinquish his position, and thanking him for his years of service.

93.    Dr. Throop also appointed an interim chair from outside the Department and announced that the College would be conducting a national search for a permanent leader for Criminal Justice.

21

94.     The Dean's actions in this regard violated the College's Constitution and Faculty Bylaws and constituted further retaliation against Plaintiff, who at the time of the Dean's decision was a qualified, interested and eligible candidate for the Chair position.

**C.     The Relationship Between Defendants Dr. Throop and Dr. Dalecki**

95.     Dean Throop appointed Dr. Dalecki as interim chair of the Criminal Justice Department effective August, 2013.

96.     The appointment violated the College Constitution and Faculty Bylaws of the UW-Platteville College of Liberal Arts and Education (LA&E) and infringed Plaintiff's rights under Wis. Stat. § 36.09(4).

97.     Dean Throop appointed Dr. Dalecki as interim chair to pressure Plaintiff to withdraw her EEOC charge (26G-2013-01269C), to dissuade her from filing a law suit against the Defendants, and to impose adverse employment actions against her if she filed a lawsuit.

98.     Dean Throop changed the organizational structure such that the chair of the Department was thereafter an administrative position, subordinate to the Dean and not accountable to the department.

99.     Dr. Dalecki had applied for a tenure track position in the Criminal Justice Department in 2010 and 2011, and on both occasions his application was rejected as he did not meet the minimum requirements for membership in the Department.

22

100.   Prior to August 2013, Dr. Dalecki never taught a course offered by the Criminal Justice Department.

101.   As of August 2013, Dr. Dalecki was not and is not now qualified to teach most courses offered by the Criminal Justice Department.

102.   In September 2013, the Criminal Justice Department elected Dr. Gibson as chair, but Dean Throop vetoed the choice of Dr. Gibson and continued Dr. Dalecki as interim chair over the objections of Plaintiff and nearly all faculty of the Criminal Justice Department.

103.   Dean Throop failed to conduct another election as required by LA&E Constitution Article VI, Sec. 4, ¶ 4 which states: "Should the Dean not concur with the department's choice, he or she will (1) inform the members of the department of the reason(s) and (2) conduct a new election."

104.   Two grievance committees and an appeals committee recommended that the next search for chair of the Criminal Justice Department be conducted in accordance with the LA&E Constitution.

105.   Nearly all faculty and staff of the Criminal Justice Department, including Plaintiff, objected to Dean Throop's appointment of Dr. Dalecki as interim chair.

106.   When Dr. Dalecki's term as interim chair was ending, on August 29, 2014, Dean Throop argued to the Department faculty that they should continue Dr. Dalecki and delay the search for a permanent chair for another year.

23

107.   Dean Throop refused to solicit nominations for chair from the Department.

108.   Instead Dean Throop appointed Dr. Timothy Zauche, from the Chemistry Department, to chair the search committee for a new Criminal Justice Department chair.

109.   Upon information and belief Dr. Zauche is a personal friend of Dr. Dalecki.

110.   There were qualified, available and willing faculty members in the Criminal Justice Department to chair the search, including Plaintiff.

111.   Dr. Zauche is and was at that time tenured in the Chemistry Department and had no affiliation with the Criminal Justice Department.

112.   On October 7, 2014, Dean Throop changed the wording of the advertisement for the Criminal Justice Department chair without obtaining consensus from the Department.

113.   She changed the Department's criteria that would have excluded Dr. Dalecki from consideration to wording that would allow him to be considered.

114.   At all times relevant to this amended complaint, Dr. Dalecki engaged in adverse employment actions with regard to the Plaintiff with the knowledge and approval, express or tacit, of Defendant Throop.

**D**. **Defendants' Appeasement of Plaintiff**

115.   During the period between August, 2013 and March 2014, while

Plaintiff's charges were pending before the EEOC in 26G-2013-01269C, Dr. Dalecki and Dean Throop were occasionally supportive of Plaintiff.

116.    On October 3, 2013, Dean Throop corresponded with the Plaintiff to praise her teaching ability, writing that she couldn't be more pleased to hear about Plaintiff's successes and thanking her for all she was doing for the students.

117.    On November 21 and 22, 2013, Dr. Dalecki printed, signed, and gave Dr. Burton a certificate reading "Sabina won."

118.    On March 13, 2014, Dean Throop requested an equity adjustment to Plaintiff's salary retroactive to August, 2013.

119.    On April 3, 2014, Dean Throop was video recorded telling a faculty forum audience that Plaintiff "will be providing you with some real interesting pieces of her expertise, profiling and cyber security."

**E.  Adverse Employment Actions of Defendant Dr. Throop**

120.    In September, 2014, Dean Throop initiated a national search for a new chair in violation of policy and against the recommendations of grievance hearing findings while the Department contained members who were eligible, willing and able to serve as department chair, including Plaintiff.

121.    On December 10, 2014, Dean Throop removed Plaintiff from the search committee for the chair for the Criminal Justice Department.

122.    On October 28, 2014, Dean Throop issued a letter of direction to Plaintiff, based on false claims against Plaintiff, and directing Plaintiff to engage in

a number of actions based upon the false claims.

123.   On November 12, 2014, Plaintiff filed a grievance in an attempt to obtain an internal administrative remedy for the letter of direction.

124.   On December 1, 2014, Dean Throop wrote a letter to the chair of the grievance commission that derailed Plaintiff's grievance hearing.

125.   On December 16, 2014, Dean Throop falsely accused Plaintiff of canceling classes and threatened disciplinary measures in an email copied to Dr. Dalecki.

126.   Dean Throop made this false allegation with reckless disregard for its truth.

127.   Dr. Dalecki saw Plaintiff on the premises in the morning of December 16 and knew she was attending her classes but he did not inform Dean Throop.

128.   Dean Throop and her agents have refused to inform Plaintiff of the identity of the informant who provided this false information.

129.   On January 5, 2015, Dean Throop filed a complaint against Dr. Burton with Chancellor Shields, exposing Plaintiff to a threat of severe employment discipline.

130.   On January 15, 2015, Chancellor Shields directed Dr. Dominic Barraclough to conduct an investigation into Dean Throop's complaint against Plaintiff.

131.   On January 20, 2015, Plaintiff's physician certified Plaintiff's request

26

for medical leave due to potentially life threatening gastric ulcers, exacerbated by the work-related stress caused by the Defendants' conduct.

**F.  Retaliatory Motive of Defendant Dr. Dalecki**

132.    On October 17, 2013, upon learning that Plaintiff had filed a complaint with Chancellor Shields regarding Dean Throop's appointment of Dr. Dalecki as interim chair, Dr. Dalecki called Plaintiff into his office and berated her.  At that time, Dr. Dalecki told Plaintiff that he knew "where the skeletons were buried."

133.    Then, Dr. Dalecki pressured Plaintiff to withdraw her complaints. He told Plaintiff: "You can't expect to file a law suit without consequences," or words of similar significance and meaning.

134.    He told Plaintiff that her complaints were "old news" and said to her that nobody wanted to hear about them anymore.

135.    At that time, Plaintiff explained to Dr. Dalecki that her damages had not been adequately remedied and that she had been in the right.

136.    Dr. Dalecki responded: "nobody cares about that anymore," Plaintiff should "let it go," and "people will forget," or words of similar effect and meaning.

137.    In late March 2014, after Plaintiff requested and received her right to sue letter from the EEOC, but prior to the end of the 90 day window in which she had to file suit, Dr. Dalecki asked her about her intentions regarding a lawsuit. He asked Plaintiff whether it was still "on."

138.    Dr. Dalecki became upset when Plaintiff informed him that she had

not dropped her intention to sue.

139.   At that time, Plaintiff again explained to Dr. Dalecki that her damages had not been fairly addressed and that she had not done anything wrong when she handled the student's sexual harassment complaint in October 2012.

140.   Then, Dr. Dalecki became annoyed and told Plaintiff again that she should "get over it," she was getting a "pay raise," and nothing good would come from her bringing legal action.

141.   After April 14, 2014, Dr.  Dalecki's demeanor toward Plaintiff became hostile.

142.   During late spring, 2014, Dr. Dalecki assigned lower level classes to Plaintiff, a senior faculty member.

143.   Teaching higher level courses supports an application for promotion.

144.   During the month of June, 2014, personal circumstances required Plaintiff to limit her participation in support of a visiting delegation of German students to UW-Platteville.  Although Plaintiff was volunteering her time and committed to help as much as reasonably possible, Dr. Dalecki refused her offers in significant respects.

145.   Upon information and belief, Dr. Dalecki informed Dean Throop and others in the Department that Plaintiff had abandoned a responsibility that Plaintiff did not possess.

28

146.    Dr. Dalecki requested mediation and Plaintiff was willing to participate.

147.    Ultimately, Dr. Dalecki refused to participate in the mediation.

148.    On August 7, 2014, Dr. Dalecki withdrew his earlier decision that Plaintiff would mentor a new colleague, Dr. Valerie Stackman, and assigned himself to be Dr. Stackman's mentor.

149.    Mentoring responsibilities support an application for academic promotion.

150.    On July 1, 2014, Plaintiff's health had deteriorated to the point that her health care provider requested accommodation for her severe headaches due to job-related stress associated with the matters alleged in the original complaint and Dr. Dalecki's coercion as alleged and on August 15, 2014, Plaintiff was hospitalized.

151.    On August 4, 2014, Dr. Dalecki denied Plaintiff's request to teach an on-line course as part of her normal load, although Plaintiff's letter of appointment specifies that she is to teach 25% of her load in on-line courses.

152.    During the fall, 2014, Plaintiff learned from colleagues in the Criminal Justice Department that Dr. Dalecki had issued a "gag order," forbidding them to communicate with her.

153.    On August 29, 2014, Dr. Dalecki assigned a junior faculty member as chair of a search and screen committee to hire three new faculty members and refused to allow Plaintiff to be a member of the search committee.

29

154.   Dr. Dalecki subsequently refused Plaintiff's request to chair a search committee for even one of the three new faculty members.

155.   Participation on such committees, particularly as the chair of the committee, supports an application for academic promotion and gives a good first impression on new hires.

156.   A grievance committee recommended on April 19, 2013, in response to Plaintiff's allegation that Dr. Caywood retaliated against her due to her advice that a student report suspected sexual harassment to Student Affairs rather than the Department chair, that "the Criminal Justice department take advantage of Dr. Burton's willingness to be more actively involved in the hiring of new faculty members."

157.   Dr. Dalecki violated this recommendation.

158.   In October, 2014, Dr. Dalecki refused to investigate Plaintiff's allegation that a colleague had excluded her from the process of formulating the job description for the search he was chairing.

159.   On October 2, 2014, Dr. Dalecki refused Plaintiff's request to meet to discuss problems between the Plaintiff and him.

160.   He based his refusal on the advice of Dean Throop and the University System's General Counsel's office.

161.   From this date forward Dr. Dalecki refused to talk to Plaintiff with regard to department business.

162.    In fall, 2014, Dr. Dalecki excluded Plaintiff from the Department Curriculum Committee.

163.    In November, 2014, Ron Jacobus, a Criminal Justice graduate student, informed Plaintiff that on November 13, 2014, he attended a social event organized by the Department and attended by other students and Department faculty.

164.    Mr. Jacobus told Plaintiff that at the Department social function one of Plaintiff's colleagues publicly informed others that Dr. Burton had a mental disorder, that she would not be at UW-Platteville much longer, and that she had negative sentiments toward people from East Germany.

165.    Dr. Dalecki did not inform Plaintiff of these malicious statements.

166.    He did not reprimand the colleague for making the statements until he was directed to do so by Mr. John Lohmann, UW-Platteville Human Resources Director, after Plaintiff complained to Mr. Lohmann.

167.    Following the incident, Dr. Dalecki met privately with Mr. Jacobus to give him "a little bit of advice."

168.    Dr. Dalecki told Mr. Jacobus that his truthful report to Plaintiff of her colleague's defamatory remarks had caused Dr. Dalecki a "huge time suck."

169.    Dr. Dalecki warned Mr. Jacobus that he should be "very careful" about passing information on to others, because passing on the information was akin to having something explode in one's face and being hit by shrapnel.

170.   Dr. Dalecki told Mr. Jacobus that he recalled a time, when he was a master's student, when someone gave him a chance rather than cut him off at the knees and let him "crawl away bleeding."

171.   Dr. Dalecki told Mr. Jacobus that he should cast his lot with the side that was paying him and that he should learn from this mistake.

172.   In early summer, 2015, UW-Platteville cancelled the graduate assistant position that Ron Jacobus had received the prior year, although there was money available for his position and the director of the graduate assistant program was confident that Jacobus would get the position.

173.   The graduate program director had already begun the reapplication process with Jacobus.

174.   In approximately January, 2015, the Criminal Justice DRB assigned Plaintiff a lower peer evaluation grade than those which she had received contemporaneously with and prior to her advice to the student complaining of sexual harassment.

175.    Dr. Dalecki had assigned Dr. Caywood to the DRB knowing Plaintiff had filed a federal lawsuit against Dr. Caywood, and allowed Dr. Caywood to sit on the DRB committee that would evaluate Plaintiff's performance.

176.   Plaintiff objected to Dr. Caywood's role to evaluate her performance based upon his conflict of interest, but her objection was ignored.

177.   The DRB reaffirmed the lower grade after Plaintiff appealed, giving no

justification for its decision.

178.    Dr. Dalecki violated policy by not allowing non-tenured faculty members to sit on the DRB as provided by the Criminal Justice Department DRB procedures (see Gibson's appeal findings for reference).

179.    No peer evaluator sat in any of Plaintiff's classes since 2009, yet the DRB assigned peer teaching evaluation scores that were lower than those given the previous years.

180.    In late spring, 2015, Dr. Dalecki again assigned Plaintiff to lower level classes.

181.    In late spring, 2015, Dr. Dalecki assigned Plaintiff to teach a solid three hour class, normally assigned to academic staff, in contravention of Plaintiff's physician's recommendations.

182.    In late spring, 2015, Dr. Dalecki refused to grant Plaintiff's request to teach an on-line course as part of her load.

183.    During summer, 2015, Dr. Dalecki assigned fewer interns to Plaintiff than her proportionate share.

184.    But for Plaintiff's EEOC complaint and lawsuit filed on April 14, 2014, Defendant Throop would not have taken the actions alleged above.

185.    But for Plaintiff's EEOC complaint and lawsuit filed on April 14, 2014, Dr. Dalecki would not have acted for Dean Throop by taking the actions alleged above.

186.    As a direct result of the discrimination, harassment and retaliation by the Defendants, as described above, Plaintiff has suffered and will continue to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other pecuniary and non-pecuniary losses.

## V.    FIRST CAUSE OF ACTION

## Claim Against the Board for Sex Discrimination Under Title VII

187.    For her first cause of action against defendant the Board, under Title VII, Plaintiff realleges each of the preceding paragraphs as though set forth herein.

188.    By engaging in the conduct described in the preceding paragraphs including but not limited to treating Plaintiff less favorably than similarly situated male colleagues with respect to promotional opportunities, salary, performance evaluations, release time, office assignments, course assignments, prestigious committee appointments and other career advancement opportunities; withdrawing its support for Plaintiff's cyber-crime program, and; treating Plaintiff in a harsh, condescending and demeaning manner and refusing to recognize her achievements in the Department, the Board, acting through its managerial agents and employees, discriminated against Plaintiff because of her sex in violation of Title VII.

189.    The Board's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and

34

psychological injuries and other substantial injuries that will continue into the future.

## VI.   SECOND CAUSE OF ACTION

### Claim Against Dr. Caywood Under the Equal Protection Clause

190.   For her second cause of action against Defendant Dr. Caywood, under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983, Plaintiff realleges each of the preceding paragraphs as though set forth herein.

191.   By engaging in the conduct described in the preceding paragraphs, including but not limited to treating Plaintiff less favorably than similarly situated male colleagues with respect to promotional opportunities, salary, performance evaluations, release time, office assignments, course assignments, prestigious committee appointments and other career advancement opportunities; withdrawing his support for Plaintiff's cyber-crime program, and; treating Plaintiff in a harsh, condescending and demeaning manner and refusing to recognize her achievements in the Department, Dr. Caywood intentionally discriminated against Plaintiff because of her sex in violation of the Equal Protection Clause of the Fourteenth Amendment.

192.   Dr. Caywood's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and

psychological injuries and other substantial injuries that will continue into the future.

193.    Dr. Caywood's conduct, as described above, was willful and malicious and/or undertaken with intentional or reckless disregard of Plaintiff's federally protected rights, thereby entitling Plaintiff to an award of punitive damages against Dr. Caywood.

## VII.   THIRD CAUSE OF ACTION

### Claim Against Dr. Throop Under the Equal Protection Clause

194.    For her third cause of action against Defendant Dr. Throop, under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983, Plaintiff realleges each of the preceding paragraphs as though set forth herein.

195.    By implicitly condoning and/or turning a blind eye to Defendant Dr. Caywood's discriminatory treatment of Plaintiff, as described above, including, but not limited to his actions in treating Plaintiff less favorably than similarly situated male colleagues with respect to promotional opportunities, salary, performance evaluations, release time, office assignments, course assignments, prestigious committee appointments and other career advancement opportunities; his decision to withdraw his support for Plaintiff's cyber-crime program, and; his harsh, condescending and demeaning treatment of Plaintiff and refusal to recognize her

achievements in the Department, Dr. Throop violated Plaintiff 's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

196.    Dr. Throop also directly violated Plaintiff's rights under the Equal Protection Clause by assigning a chair from outside the Criminal Justice Department without first conducting a search within the Department.

197.    Dr. Throop's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other substantial injuries that will continue into the future.

198.    Dr. Throop's conduct, as described above, was willful and malicious and/or undertaken with intentional or reckless disregard of Plaintiff's federally protected rights, thereby entitling Plaintiff to an award of punitive damages against Dr. Throop.

## VIII.  FOURTH CAUSE OF ACTION

### Claim Against the Board for Retaliation Under Title VII

199.    For her fourth cause of action against Defendant the Board, under Title VII, Plaintiff realleges each of the preceding paragraphs as though set forth herein.

200.    By engaging in the conduct described in the preceding paragraphs including but not limited to withdrawing its support for Plaintiff's cyber-crime

37

program, and treating Plaintiff in a harsh, condescending and demeaning manner and refusing to recognize her achievements in the Department and denying Plaintiff the opportunity to become chair of the Department, the Board, acting through its managerial agents and employees, retaliated against Plaintiff for lawfully opposing sex discrimination in the workplace in violation of her rights under Title VII.

201.   The Board's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other substantial injuries that will continue into the future.

## IX.   FIFTH CAUSE OF ACTION

### Claim Against the Board for Retaliation Under Title IX

202.   For her fifth cause of action against Defendant the Board, under Title IX, Plaintiff realleges each of the preceding paragraphs as though set forth herein.

203.   By engaging in the conduct described in the preceding paragraphs including but not limited to withdrawing its support for Plaintiff's cyber-crime program, and treating Plaintiff in a harsh, condescending and demeaning manner and refusing to recognize her achievements in the Department and denying Plaintiff the opportunity to become chair of the Department, the Board, acting through its managerial agents and employees, retaliated against Plaintiff for

participating in a student complaint of sexual harassment in violation of her rights under Title IX.

204.    The Board's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other substantial injuries that will continue into the future.

205.    The Board's conduct, as described above, was willful and malicious and/or undertaken with intentional or reckless disregard of Plaintiff's federally protected rights, thereby entitling Plaintiff to an award of punitive damages against the Board.

## X.    SIXTH CAUSE OF ACTION

### Claim Against the Board for Violation of the Equal Pay Act

206.    For her sixth cause of action against Defendant the Board, under the Equal Pay Act, 29 U.S.C. § 206(d), Plaintiff realleges each of the preceding paragraphs as set forth herein.

207.    By engaging in the conduct described in the preceding paragraphs, including but not limited to paying Plaintiff substantially less in base pay than her male colleagues, including without limitation Aric Dutelle and Lorne Gibson, for equal work the performance of which required equal skill, effort and responsibility

and was performed under similar working conditions, the Board violated Plaintiff's rights under the Equal Pay Act.

208.   The Board's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of income and benefits.

209.   The Board's conduct, as described above, was knowing and willful, thereby entitling Plaintiff to liquidated damages against the Board.

## XI.   SEVENTH CAUSE OF ACTION

210.   For her seventh cause of action against Defendant, Dean Throop, under Title VII, plaintiff realleges each of the preceding paragraphs as set forth herein.

211.   By engaging in the conduct described in the preceding paragraphs, but not limited to wrongly denying members of the Department who were willing, able and eligible to serve as chair of the Department, including Plaintiff the opportunity to do so, falsely accusing Plaintiff in a letter of direction, falsely accusing Plaintiff of breach of her duties by skipping classes, filing a Chapter 6 complaint against her based upon false premises, removing her from service on the search committee for the permanent chair, and interfering with Plaintiff's use of the internal grievance procedures to resolve the claims set forth here, Dean Throop retaliated against Plaintiff for lawfully opposing sex discrimination in the workplace in violation of her rights under Title VII.

212.   Dean Throop's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of

reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other substantial injuries that will continue into the future.

## XII.   EIGHTH CAUSE OF ACTION

213.   For her eighth cause of action against Defendant, Dr. Dalecki, under Title VII, Plaintiff realleges each of the preceding paragraphs as set forth herein.

214.   By engaging in the conduct described in the preceding paragraphs, but not limited to coercing Plaintiff to drop her EEOC charge and this lawsuit, assigning lower level classes to Plaintiff, limiting Plaintiff's assistance with the visiting delegation of German students, refusing mediation, withdrawing Plaintiff's mentorship of Dr. Stackman, refusing to assign her on-line teaching in violation of her appointment letter, "gagging" her colleagues, refusing to assign her chair responsibilities in search and screen committees, refusing to talk to her with regard to Departmental business, excluding her from the curriculum committee, refusing to correct Dean Throop's false accusation of skipping her teaching responsibilities, threatening the graduate student who had truthfully reported a colleague's defamatory statements regarding Plaintiff, and assigning Dr. Caywood to the DRB to evaluate Plaintiff despite the fact that Plaintiff had named him as Defendant in this action, Dr. Dalecki retaliated against plaintiff for lawfully opposing sex discrimination in the workplace in violation of her rights under Title VII.

215.   Dr. Dalecki's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of

reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other substantial injuries that will continue into the future.

## XIII.  NINTH CAUSE OF ACTION

216.    For her ninth cause of action against Defendant, Board, under Title VII, plaintiff realleges each of the preceding paragraphs as though set forth herein.

217.    By engaging in the conduct described in the preceding paragraphs, acting through its managerial agents and employees, the Board retaliated against Plaintiff for filing a charge of discrimination with the EEOC and for filing this complaint of discrimination with this Court.

218.    The Board's conduct, as described above, caused Plaintiff to suffer substantial damages including loss of employment and career opportunities, loss of reputation, loss of income and benefits, emotional distress, physical and psychological injuries and other substantial injuries that will continue into the future.

## XIV.  JURY DEMAND

219.    Plaintiff requests that the issues in the above-captioned matter be tried by a jury of six persons.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Past and future loss of income and benefits;

B.    Liquidated damages in an amount equal to Plaintiff's back pay loss under the Equal Pay Act;

42

C.       Compensatory damages for all pecuniary and non-pecuniary losses

sustained by Plaintiff, in an amount to be determined;

D.       Punitive damages against each of the Defendants;

E.       A finding of unlawful sex discrimination and retaliation;

F.       Reasonable attorneys' fees and costs incurred in bringing this action;

G.       Such other relief as the Court may deem just and proper.

                                Respectfully submitted,

September 11, 2015                s/Timothy E. Hawks_____
                                Timothy E. Hawks, SBN 1005646
                                B. Michele Sumara, SBN 1010181
                                Attorneys for Plaintiff
                                Hawks Quindel, S.C.
                                PO Box 442
                                Milwaukee, WI  53201-0442
                                Telephone: 414-271-8650
                                Fax: 414-271-8442
                                Email: thawks@hq-law.com
                                        msumara@hq-law.com