IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SABINA BURTON,

                    Plaintiff,

   v.

BOARD OF REGENTS OF THE UNIVERSITY
OF WISCONSIN SYSTEM,
THOMAS CAYWOOD, ELIZABETH THROOP, and
MICHAEL DALECKI,

                    Defendants.

OPINION & ORDER

14-cv-274-jdp

Plaintiff Sabina Burton is now a tenured associate professor of criminal justice at the University of Wisconsin-Platteville (UWP). Several years ago, Burton advocated for a student who complained of sexual harassment at the hands of another UWP professor. Burton contends that, as a consequence of her advocacy for this student and her subsequent efforts to assert her own rights, she has faced discrimination and retaliation from UWP colleagues and administrators. She brings this suit against defendant Board of Regents of the University of Wisconsin System (the entity responsible for UWP) and three employees of UWP.

Burton's complaint alleged multiple causes of action under four federal laws: Title VII of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972; the Equal Pay Act; and the Equal Protection Clause of the Fourteenth Amendment. Defendants have moved for summary judgment on all claims. In response, Burton has conceded that she cannot succeed on many of her claims, leaving two retaliation claims that Burton regards as the heart of this suit. First, Burton contends that she faced retaliation for assisting the student with her sexual harassment complaint, in violation of Title VII and Title IX. Second, Burton contends that, also in violation of Title VII, she faced retaliation for asserting her own

rights by filing a charge of discrimination with the Wisconsin Department of Workforce Development-Equal Rights Division (ERD) and by filing this lawsuit.

Title VII and Title XI prohibit retaliating against an individual who asserts her rights in employment and education, respectively. But neither law requires—or, frankly, permits—a federal court to referee every dispute generated by the friction of day-to-day operations in university departments. As this opinion explains, Burton perceived slights and a lack of collegiality, and she felt personal embarrassment at the hands of her colleagues. But those are not materially adverse actions, and they do not amount to actionable retaliation. Burton also received a formal letter of direction, which led to a disciplinary complaint. Although these were adverse actions, Burton has not adduced evidence to show a causal link to her protected activity (i.e., filing a charge of discrimination and bringing this lawsuit).

As a university faculty member, Burton works with a high degree of autonomy. But she is not immune from supervision and discipline. Federal courts are properly reluctant to second-guess the personnel decisions of university administrators, and Burton has given this court no reason to do so here. Defendants are entitled to summary judgment.

## UNDISPUTED FACTS

Except where noted, the following facts are undisputed.[1]

Burton began working at UWP in 2009, as a tenure-track assistant professor in the criminal justice department, which is part of the College of Liberal Arts and Education.

---

[1] Several of Burton's citations to the record in her proposed findings of fact are incorrect. The errors appear to be careless ones: the wrong paragraph of an affidavit, or an incorrect docket number. Defendants have compounded the problem by objecting to the proposed facts as unsupported, rather than providing the correct citation (which is obvious in most cases). Because these facts are not actually in dispute, the court includes them in this opinion.

Burton was a successful faculty member, and in January 2012, she was promoted to associate professor. At the time, defendant Thomas Caywood was chair of the criminal justice department. Defendant Elizabeth Throop became dean of the College in June 2012.

The trouble starts in October 2012. One of Burton's colleagues in the criminal justice department was lecturing on the subject of "breach experiments," which are essentially provocations designed to display social norms by violating them so that they can be studied. The professor demonstrated a breach experiment: in plain view of the class, he handed a female student a note that read "Call me tonight!!" and included his cell phone number. Dkt. 51-1. The student did not recognize the exchange as a demonstration, and she was upset by the note. Later that day, she sought out Burton to talk about the incident. Afterwards, Burton emailed dean Throop, alerting her to the apparent harassment of the student. Throop suggested that the student speak to the dean of students.

The next day, Burton followed up on the student's complaint and spoke with Caywood. Burton also forwarded to Caywood an email that she had received from the student the night before, with an image of the note. Burton indicated that she would contact student affairs, but she did not tell Caywood that she had already emailed Throop. Caywood spoke with the breach-experimenting professor that day, learned that the note had been part of a demonstration, and advised the professor to send an apology to the entire class, which he did. When Caywood emailed Burton to explain the situation, Burton suggested that department faculty be informed about all such experiments in the future. Caywood responded that this was not necessary and that if students had problems with faculty members, then they needed to come see him to sort out those problems.

3

Word got around to administrative personnel at UWP, including the chancellor, the provost, and the human resources department. Over the next two days, Throop emailed Caywood to express her serious concerns with the experiment and with Caywood's response to it. Throop also emailed Burton—who, by this point, had become the student's informal liaison and advocate—asking her to assure the student that the matter would be taken seriously and resolved as quickly as possible. When Caywood asked to interview the student to find out what happened, the director of human resources told him to drop the issue because her office would handle it. The parties do not explain how UWP eventually resolved the incident, but the resolution of the underlying complaint is not relevant to Burton's claims in this case.

In the following months, Burton experienced what she perceived to be unwarranted public criticism for the way that she had handled the student's complaint. For example, about one week after the incident, Caywood prepared a memo outlining the steps that faculty members should take if a student came to them with a problem concerning another faculty member. The memo instructed that students should first contact the faculty member in person to resolve the issue directly, if the problem was along the lines of a low grade or poor attendance. For complaints about what a faculty member said or did, students were to come directly to Caywood. For behavior that could potentially amount to criminal conduct, faculty members were to contact campus police. Caywood circulated this memo to the members of the criminal justice department.

At a department meeting in November 2012, Caywood reiterated his instruction that student issues should be brought to his attention so that harmless matters did not go all the way to the provost. Burton felt that the announcement was a veiled public reprimand from

her department chair, and she emailed the director of human resources at UWP to request a meeting. She wrote that Caywood's comments were in retaliation against her for assisting the student and that she could not accept Caywood's "ongoing bitterness." Dkt. 54-14.

About the same time, Burton perceived a sudden loss of support from Caywood and Throop regarding Burton's efforts to develop a new curriculum in cybersecurity, which Burton, Caywood, and others had been working on since February 2012. The project would involve an extended process. Establishing a new course required approval from the college curriculum committee, and then approval of the university curriculum committee. A new emphasis, program, major, or minor, would ultimately need approval from the Board of Regents. As a preliminary step, Burton and Caywood had worked together on a grant application to the National Science Foundation to secure substantial funding for the cybersecurity curriculum, although the application was unsuccessful.

In the fall of 2012, Burton secured an informal offer from AT&T of a modest amount of private funding for the cybercrime program. In the formal written application to AT&T, Burton wrote that UWP would use the money "[t]o support the development and implementation of a cyber-security curriculum for undergraduate and graduate students." Dkt. 37-1, at 2. The application also indicated that UWP was "in the process of developing a curriculum for cyber-security," and that a milestone of the project would be to develop and implement an undergraduate cyber-security course by February 2013. *Id.* at 2-3.

Throop and Caywood were concerned with how Burton was portraying the status of UWP's cybersecurity program. In January 2013 (three months after the student harassment incident), an AT&T representative drafted a press release to announce the company's donation. The representative sent the release to Burton, who edited the draft and returned it

the next morning. Burton attached her edits to an email on which Caywood and Throop were copied. As edited, the release referred to "the development of a new cyber security program," and to a "new course . . . expected to be available to undergraduate students beginning spring of 2012." Dkt. 36-7, at 1.[2] But Burton had not yet formally submitted any proposed cybersecurity courses to the college curriculum committee or to the university curriculum committee.

Throop responded to the draft press release in an email to Burton, Caywood, and AT&T's representative, writing that: "This press release concerns me deeply. There are a number of highly inaccurate--indeed, misleading--statements regarding the status of cyber-security curricula at the University of Wisconsin-Platteville. I am not confident that the ceremony being planned is wise given this." Dkt. 53-16, at 1. Caywood also responded to Burton's email, noting similar concerns and cautioning Burton "on how [she was] presenting [her] ideas and visions in the media." Dkt. 53-4, at 2. Later that same day, however, Throop emailed Burton and Caywood to explain that she and the AT&T representative had talked over the phone and agreed to additional revisions that would alleviate Throop's concerns. On January 30, 2013, AT&T presented $7,000 to Burton in a public ceremony.

Around the same time, Caywood and Throop also identified issues with two websites that Burton had created, both of which discussed a cybersecurity program at UWP. Caywood and Throop felt that these websites inaccurately suggested that UWP had developed or was actively developing a cybercrime program. Throop tried to arrange a meeting with Burton and

---

[2] The press release was drafted to go out on January 28, 2013. Dkt. 36-7, at 1. Thus, the reference to "spring of 2012" appears to have been a typo, although the parties do not address the discrepancy.

Caywood to discuss the issues with the websites and the AT&T funding, but Burton refused to meet.

In January 2013, at her earliest eligibility, Burton applied for tenure. She was granted tenure, effective for the 2013-14 academic year. Burton thus enjoyed substantial job security: tenure extends for an unlimited period, and tenured faculty can be dismissed only for just cause and only after due notice and a hearing. *See* Wis. Admin. Code UWS § 4.01.

In August 2013, Burton filed a discrimination charge with the ERD. The charge alleged that: (1) Caywood had discriminated against her because she was a woman and retaliated against her for reporting the student harassment; (2) Throop and the human resources director had discriminated against her; (3) Throop had defamed her; and (4) the university had been deliberately indifferent to her grievances.

In the summer of 2013, Caywood stepped down, and defendant Michael Dalecki became interim chair of the criminal justice department. But the change of chair did not end Burton's frustrations. After Burton filed her charge with the ERD, she continued to experience what she perceived to be hostile treatment at the hands of her colleagues and supervisors. For example, Dalecki had several conversations with Burton, during which he encouraged her to drop her ERD charge and lawsuit and expressed disappointment or told Burton to "get over it" each time she refused to do so.[3] Dalecki also told Burton that she could not expect to file a lawsuit without suffering consequences, reminding her to think about how her actions would affect her chances of eventually becoming chair of the criminal justice department. At least one other faculty member also pressured Burton to drop her suit,

---

[3] Defendants dispute what exactly Dalecki said, and they contend that Burton has taken his comments out of context. But there is no dispute that Dalecki encouraged Burton to drop her claims.

indicating that Burton would be "dean material," but not if she continued to challenge administrators.

Burton continued to disagree with Dalecki and others throughout the 2013-14 academic year and into the summer. The disagreements concerned committee appointments, personnel changes, and departmental management. In addition, Dalecki chastised a graduate student who shared with Burton comments about her that he had overheard a department staff member make at a social event. The graduate student later lost his position because of insufficient funds. Burton contends that all of these actions were in retaliation for her filing a charge with the ERD and a lawsuit in this court.

Burton also had run-ins with Throop. Their conflict came to a head in October 2014, when Throop wrote Burton a letter of direction. The letter identified seven events that Throop described as showing "a consistent pattern of unprofessional and inappropriate behavior." Dkt. 37-15, at 5. In brief, Throop was concerned that Burton had:

- accused Dalecki of misconduct without a factual basis for doing so, and made these accusations public by emailing the entire department, the provost, and the chancellor;

- written an inflammatory email to the entire department incorrectly accusing a recently resigned colleague of unethical behavior and implying that she would ask the Wisconsin Attorney General to investigate;

- abruptly passed off responsibility for a visit from colleagues in Germany after having organized the visit;

- asked a new assistant professor who had been Burton's mentee to house-sit for Burton during the summer (which Throop felt was unprofessional, given Burton's seniority over the mentee);

- sent an email to a staff member using an unnecessarily accusatory and unprofessional tone;

- threatened a junior faculty member with consequences to his future bid for tenure because Burton incorrectly believed that he had improperly carried out his duties as the chair of a committee; and

- encouraged students to bypass the department chair with complaints against other professors because he was biased.

Throop concluded the letter by providing Burton with five specific directions, and she warned Burton that failure to follow the directions would result in disciplinary action.

Burton responded to the letter of direction in writing. She generally disagreed with Throop's summary of the relevant facts, and she flatly refused to accept any of Throop's directions. Given Burton's refusal to cooperate, Throop filed a complaint with the chancellor on January 5, 2015, pursuant to Wis. Admin. Code UWS § 6.01.[4] Throop asked the chancellor to write Burton a formal letter of reprimand that would be placed in her personnel file. At this point, it is not clear from the record whether Throop's complaint has been resolved, nor what discipline, if any, Burton has received.

Another incident occurred in December 2014, when Throop incorrectly accused Burton of cancelling a class without permission. Throop emailed Burton about the canceled class, and she copied Dalecki (but no one else). The email was terse, and it concluded by stating that "I will be forced to pursue disciplinary measures as a result." Dkt. 43-3, at 2. Throop's information turned out to be incorrect: Burton had not cancelled class. But rather than responding directly to Throop to explain, Burton sent an email to her class:

---

[4] This provision establishes complaint procedures for "conduct by a faculty member which violates university rules or policies . . . , but which [is] not serious enough to warrant dismissal proceedings." Wis. Admin. Code UWS § 6.01.

9

Dear Student,

Dean Throop falsely accused me of canceling my class last Friday and wants to fire me over it. Please see the email below to see her extremely harsh and false accusations.

I ask that you please reply to this email with your confirmation that I did teach my class last Friday, Dec 12, 2014 to prove to Dean Throop that I did not cancel the class. This is extremely important for me. Dean Throop wants to fire me. If you came to class on Friday, Dec 12, 2014 you know that I was there. Dean Throop wants to discipline me for not being at the class. She is just looking for reasons to "discipline" me. Your confirmation that I was in class on that day will convince her that she has her facts wrong and could save me from severe discipline that I don't deserve.

Why does Dean Throop want to hurt me you ask? Well, since I am asking you for an honest response I will give you an honest answer to this question.

On Oct 11, 2012 a female student came to me with a complaint of a sexual advance by a male faculty member. I helped the student report the complaint to Student Affairs. I have been mercilessly harassed since then for my actions in assisting that student.

I have tried to keep students out of this conversation but the Dean has put me in a position where I need students to confirm my presence in my classes last Friday. I need your help. Please reply to this email as soon as you can with your confirmation that I was in class on Friday, Dec 12, 2014.

Thank you so much.

*Id.* at 1. Several students responded that Burton had taught her class, and Burton forwarded at least one of the responses to Throop, Dalecki, the provost, the chancellor, and human resources. Throop did not discipline Burton for cancelling class.

Burton pursued several grievances to address these issues with UWP administrators. Those efforts were unsuccessful, and so Burton filed suit in this court on April 14, 2014. Dkt. 1. Burton filed a second amended complaint on September 11, 2015. Dkt. 28. The

10

court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Burton's claims arise under federal law.

## ANALYSIS

Burton's second amended complaint alleged multiple causes of action, some against the Board of Regents, some against Caywood, some against dean Throop, and some against Dalecki. Defendants have moved for summary judgment on all causes of action. Dkt. 32. Burton's brief in opposition to defendants' motion concedes to dismissal of most of the causes of action, with the exception of the retaliation claims that she brings against the Board of Regents as the legal entity that runs UWP and employs her. Dkt. 57, at 4.

Summary judgment is appropriate if defendants show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Defendants are entitled to summary judgment on a claim if they show that Burton lacks evidence to support an essential element on which she bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, Burton "must set forth specific facts showing that there is a genuine issue for trial." *Id.* She may not simply rely on the allegations in her pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [her] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).

## A. Retaliation for supporting the student's harassment complaint

Burton alleges that defendants retaliated against her for supporting the student who complained of harassment in October 2012. Burton contends that this retaliation violates both Title IX (which prohibits forms of sex discrimination in education), Dkt. 28, ¶¶ 202-05, and Title VII (which prohibits workplace discrimination), *id.* ¶¶ 199-201.

### 1. Title IX

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Unlike Title VII, Title IX does not include a separate retaliation provision. Nevertheless, "Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005).

Courts apply Title VII's retaliation framework to evaluate retaliation claims under Title IX. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). Under this framework, a plaintiff can prove her retaliation claim using either the direct method of proof or the indirect method of proof. *Id.* Burton is proceeding via the direct method.[5] Burton must therefore adduce evidence that: (1) she engaged in protected activity under Title IX; (2) defendants took an adverse action against her; and (3) there is a causal connection between her protected activity and the adverse action. *Cung Hnin v. TOA (USA), LLC,* 751

---

[5] Burton does not explicitly forgo the indirect method. But she does not contend that she "was treated less favorably than similarly situated employees who did not engage in statutorily protected activity," which is an essential element of a prima facie case under the indirect method. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 688 (7th Cir. 2010).

F.3d 499, 508 (7th Cir. 2014). The court will assume without deciding that Burton engaged in protected activity by assisting the student who complained of harassment. But even so, the evidence of record confirms that defendants did not take any materially adverse actions against Burton. Because Burton cannot establish a necessary element, defendants are entitled to summary judgment on Burton's Title IX retaliation claim.

### a. Preemption

Before turning to the merits, the court addresses defendants' preliminary argument that Burton's Title IX claim is preempted by Title VII. Defendants rely on the general rule that "Title VII's own remedial mechanisms are the only ones available to protect the rights created by Title VII." *Yasiri v. Bd. of Regents of Univ. of Wis. Sys.*, No. 99-cv-0051, 2000 WL 34230253, at *8 (W.D. Wis. Jan. 28, 2000) (quoting *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862 (7th Cir. 1996), *abrogated by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009)). According to defendants, Burton cannot pursue a Title IX claim in this case because she is seeking redress for injuries that she suffered in the context of her employment. The court disagrees.

Defendants' expansive reading of the preemption rule would run headlong into the Supreme Court's decision in *Jackson*, which allowed a teacher to bring a retaliation claim under Title IX based on allegations that he received negative performance reviews and was removed from a coaching position in retaliation for complaining about unequal funding for a girls basketball team. 544 U.S. at 171. Burton's case is analogous in all material respects: she helped a student address sexual harassment by a professor, and then she suffered unfavorable employment actions. It is irrelevant that Burton was not personally subjected to discrimination under an education program because Title IX "is broadly worded; it does not

13

require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint." *Id.* at 179.

The authority that defendants cite does not support preempting Burton's Title IX claim. For example, defendants invoke *Ludlow v. Northwestern University*, in which another district court concluded that "Congress did not intend that Title IX serve as an additional protection against gender-based discrimination regardless of the available remedies under Title VII." No. 14-cv-4614, 2015 WL 5116867, at *4 (N.D. Ill. Aug. 28, 2015) (citations and internal quotation marks omitted). But *Ludlow* was not a retaliation case; it involved a professor who alleged that his university discriminated against him on the basis of his gender by investigating him for sexual assault and treating him differently in the investigation than it did the female student who had complained of assault. *Id.* at *1-3. The same is true for many of the decisions that defendants cite to support their preemption arguments. These cases involved allegations of direct sex discrimination, not retaliation for conduct that Title IX protects. *See, e.g., Waid*, 91 F.3d at 860 (teacher denied full-time position because of her sex); *Blazquez v. Bd. of Educ. of Chi.*, No. 05-cv-4389, 2006 WL 3320538, at *11 (N.D. Ill. Nov. 14, 2006) (teacher denied an aide because of her sex).

Title VII does not preempt Burton's Title IX retaliation claim. The court turns to the merits of that claim.

### b. Materially adverse action

Burton identifies what she contends are two materially adverse actions that constituted retaliation under Title IX: (1) Caywood publically criticized Burton in the months following her report of student harassment; and (2) Caywood and dean Throop withdrew their support of Burton's efforts to develop a cybercrime curriculum. Dkt. 57, at

14

10-19. Based on the undisputed facts of this case, no reasonable jury could conclude that either action was materially adverse.

The standard for materiality is the same in Title IX and Title VII cases. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728-29 (7th Cir. 2009). "Not everything that makes an employee unhappy is an actionable adverse action." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106-07 (7th Cir. 2012) (quoting *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009)). "Because an adverse employment action under Title VII's retaliation provision must be 'materially' adverse, it is important to separate significant from trivial harms." *Id.* (citations and internal quotation marks omitted). Thus, "[i]n a retaliation case, an adverse action is one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011) (citations and internal quotation marks omitted). None of the adverse actions that Burton identifies for her Title IX claim satisfy these requirements.

Burton proposes a lenient standard for determining whether defendants' actions were materially adverse because her protected conduct in this case was altruistic: she was not complaining about harassment that *she* suffered, but was instead helping someone else handle harassment. Indeed, the Seventh Circuit has recognized that "it takes less to deter an altruistic act than to deter a self-interested one." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005); *see also Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 746 (7th Cir. 2002). But even under Burton's proposed standard, she has not identified conduct that rises to the level of actionable retaliation.

Caywood's public criticism of how Burton handled the student incident was not a materially adverse action. According to Burton, Caywood's new policy was obviously intended to criticize or reprimand her because it directed faculty to handle student complaints differently from the way that she handled the incident in October 2012. As Burton paraphrases, Caywood announced to the department that someone had "made a big deal out of a student complaint and before notifying him took it all the way to the provost." Dkt. 54-14. But the evidence of record is that Caywood developed a policy for how faculty should handle issues that students had with professors because he believed that the lack of instruction was at least partly responsible for how the student incident had been handled—or "mishandled," to use Caywood's words. Dkt. 36, ¶ 31. The policy did not expressly denounce the way that Burton addressed the incident; it merely established a different procedure for responding to similar events in the future. Dkt. 53-6.

The other instances of Caywood being less than collegial to Burton do not to amount to actionable retaliation. For example, Burton takes issue with Caywood "tersely asking her for a timeline and identities of those to whom she had spoken" about the student incident. Dkt. 57, at 11. But Caywood's email simply sought information; he did not accuse Burton of wrongdoing or express concerns over how she handled the situation. Dkt. 53-29. And once the director of human resources explained to Caywood that he was not to investigate further, Caywood dropped the issue. Dkt. 36, ¶ 30 and Dkt. 53-5.

Burton also vaguely alludes to Caywood having significant discretionary power over the lives and career prospects of faculty members by virtue of having been the chair of the department. Dkt. 57, at 11-12. She contends that in light of the power imbalance, Caywood's implicit criticism was particularly troubling for her. But tellingly, Burton does not

16

base her Title IX retaliation claim on any adverse decisions that Caywood made that affected her career. In fact, in November 2012—the same month as his alleged reprimand—Caywood approved Burton's request to take on an additional course (and receive additional compensation). Two months later, Caywood approved Burton's request to use department funds to take students to a conference. And finally, Caywood supported Burton's successful bid for early tenure in 2013.

The court will accept Burton's recollection that Caywood publicly expressed irritation at her making a big deal out of the student complaint. But no reasonable jury could conclude that the lone statement would deter professors from helping students report sexual harassment in the future. Quite the opposite: Caywood's purpose was to give faculty in his department a uniform procedure for addressing student complaints. Dkt. 36, ¶ 31. Construing the new policy as an implicit reprimand—as Burton asserts it was—does not change the analysis. "Even under the more generous standard that governs retaliation claims, a reprimand without more is not an adverse employment action." *Chaib v. Indiana*, 744 F.3d 974, 987 (7th Cir.), *cert. denied,* 135 S. Ct. 159 (2014) (citations and internal quotation marks omitted).

Burton's dissatisfaction with how Caywood presented the policy and treated her in the months following the student incident is essentially a complaint about the "petty slights or minor annoyances that often take place at work and that all employees experience," but which do not qualify as materially adverse actions. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Neither a bruised ego, nor a lone instance of public humiliation constitutes actionable retaliatory conduct. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885-86 (7th Cir. 1989).

17

Burton therefore cannot base a Title IX retaliation claim on Caywood's response to how she handled the student incident.

For substantially similar reasons, Burton's consternation over Throop and Caywood's response to the AT&T press release cannot support her Title IX claim either. The evidence of record contradicts Burton's assertion that Throop and Caywood damaged her reputation by informing the AT&T representative that the draft press release was unacceptable. Throop's email was direct: it conveyed her concern about misleading statements that described the status of the cybersecurity curricula at UWP. But the email was not accusatory or disparaging. Throop did not attribute the misstatements to Burton—or to anyone, for that matter. Dkt. 53-16, at 1.

Although Burton speculates that the situation damaged her reputation with AT&T, as well as with a state legislator, she has not adduced admissible evidence to support her speculation. To the contrary, the entire controversy was short-lived. Ten minutes after her first email, Throop sent a second email explaining that the AT&T representative would edit the press release to alleviate her concerns. AT&T went through with the donation, and Burton received the check at a public ceremony. There is no evidence in the record that Burton later tried, unsuccessfully, to obtain additional funding from AT&T, nor is there evidence that the state legislator or anyone else refused to work with Burton because of the incident with the AT&T press release.

Caywood's email concerning the press release and the representations about UWP's cybersecurity curricula that appeared on Burton's websites was stern, and he ended the message by cautioning Burton about how she was presenting her ideas in the media or on the Internet. Dkt. 53-4, at 2. But the email was essentially constructive. Caywood explained the

18

steps for developing a new curriculum, described the last time that the department had undertaken such a project, and gave Burton specific examples of the statements that she had made that were, in his opinion, inaccurate. *Id.* at 1-2. Burton does not contend that Caywood sent the email to anyone else or voiced his concerns to Burton's peers or supervisors. Thus, other than her own disappointment or disagreement with Caywood's opinion, Burton has not adduced evidence of negative consequences that she experienced because of the email. Rather, in the midst of what Burton perceived as hostility, she was awarded tenure. Under these circumstances, no reasonable jury could agree with Burton that Throop's email or Caywood's email (or the two combined) would have dissuaded future efforts to assist students with potential harassment.

Burton has failed to adduce evidence of a materially adverse action, an essential element of her Title IX claim. Defendants are therefore entitled to summary judgment on Burton's retaliation claim under Title IX.

### 2.  Title VII

Burton also contends that the retaliation that she faced for helping the female student violates Title VII. As with her Title IX claim, Burton must adduce evidence of three elements to make a prima facie case of retaliation under Title VII: (1) protected activity; (2) a materially adverse action; and (3) a causal connection. *Cung Hnin*, 751 F.3d at 508. The court has already concluded that Burton did not suffer a materially adverse action in response to assisting the student. But this claim fails for a second reason as well: Burton did not engage in an activity protected under Title VII when she assisted the student.

Title VII prohibits employers from retaliating against employees who engage in statutorily protected activity. 42 U.S.C. § 2000e-3(a). Here, Burton cannot assert a Title VII

retaliation claim based on these allegations because there was no employment relationship between the student and the professor and because Burton was not complaining that she herself was harassed. Thus, Burton was not opposing an unlawful *employment* practice, which is a required element of a retaliation claim under § 2000e-3(a). Burton does not respond to defendants' argument, essentially conceding the point. *See Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001). Defendants are therefore entitled to summary judgment on Burton's claim that she faced retaliation for helping the student in violation of Title VII.

## B. Retaliation for Burton's own charges of discrimination

Burton also alleges that defendants retaliated against her for filing charges of discrimination and this lawsuit. There are two administrative charges at issue in this case. The first charge, which Burton filed with the ERD on August 13, 2013, alleged that she had been discriminated against because of her sex and retaliated against for assisting the student with her complaint. Dkt. 54-1. The second charge, which Burton filed with the Equal Employment Opportunity Commission (EEOC) on December 9, 2014, alleged that she had experienced intimidation and disciplinary action "[a]s a result" of filing her first charge of discrimination. Dkt. 54-2.

### 1. Exhaustion

The court again starts with a preliminary issue before turning to the merits of this retaliation claim. Defendants acknowledge that filing a charge is a protected activity under Title VII. But they contend that Burton's second charge did not provide enough detail to fulfill her obligation to exhaust administrative remedies before filing a federal lawsuit. *See Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) ("As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge.").

Specifically, defendants argue that the second charge did not identify the adverse or disciplinary actions that Burton suffered in retaliation for filing her first charge.

Burton disagrees, asserting that her second charge gave adequate notice of her claims. In the second filing, Burton charged sex discrimination and retaliation beginning on April 15, 2009, and continuing through October 28, 2014 (the date of dean Throop's letter of direction). Dkt. 54-2, at 11. Burton also complained of a "continuing action." *Id.* Defendants are correct that the charge does not identify Throop or Dalecki as the retaliators, but Burton indicated that she had "been subjected to intimidation and disciplinary action," *id.*, which are the two adverse actions that she complains of in this lawsuit. Regardless, Burton's intake questionnaire and supplement to her second charge provided plenty of details about the retaliation that she wanted the agency to investigate. These materials satisfy a plaintiff's obligation to exhaust her claims, so long as it is clear that she intended for the agency to investigate her allegations. *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000). Such is the case here.

Burton engaged in protected activity when she filed her first charge in August 2013. Burton's second charge exhausted her administrative remedies for the retaliation that she suffered after filing the first charge. Burton has satisfied the exhaustion requirement, and the court turns to the merits of her claim.

## 2.  Materially adverse actions

Burton identifies two categories of adverse actions that she suffered in retaliation for filing a charge of discrimination and beginning this lawsuit: (1) during the 2013-14 school year, Dalecki repeatedly pressured Burton to drop her charges; and (2) between October 2014 and January 2015, dean Throop took or threatened to take disciplinary actions against

21

Burton. Dkt. 57, at 23-24. No reasonable jury could conclude that Dalecki's conduct toward Burton was materially adverse. The same is true for one instance in which Throop threatened Burton with discipline, but later rescinded that threat. The two instances in which Throop actually pursued discipline, however, qualify as materially adverse actions.

Again, the same standard of materiality applies: "an adverse action is one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman*, 637 F.3d at 740 (citations and internal quotation marks omitted).

According to Burton, Dalecki began pressuring her to drop her lawsuit in October 2013. Burton emphasizes that, in context, Dalecki's statements could reasonably be construed as threats. And by "context," Burton means that Dalecki was the chair of her department and had been appointed by Throop over the objections of several members of the department. Calling Dalecki's actions "threats" overstates the evidence; Burton did not go that far during her deposition, instead testifying that Dalecki "tried to convince [her] that it would be in [her] best interest to let go of it." Dkt. 39 (Burton Dep. 451:19-20). But even accepting Burton's characterization, Dalecki's statements do not qualify as materially adverse actions because nothing ever came of them. "[I]t is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) (citing *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003)); *see also Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005) ("Almost all of what Dunn characterizes as 'retaliation' is verbal requests from Coy to withdraw her complaint of sexual harassment. . . . Yet his statements did not cause Dunn any injury (that is to say, no adverse employment

22

action occurred).”). Burton has adduced evidence that Dalecki pressured her to drop her charges, lawsuits, and grievances. But without more, this pressure is not materially adverse. Burton cannot base her Title VII retaliation claim on Dalecki's statements.

For the same reasons, Burton cannot base her Title VII retaliation claim on Throop's December 2014 email threatening to discipline her for cancelling class. Although being falsely accused of cancelling class may have caused Burton some anxiety, she was not disciplined and was able to quickly and easily refute Throop's accusation. Thus, just as Dalecki's unfulfilled threats to block Burton from advancing her career do not qualify as materially adverse actions, neither does Throop's unfulfilled threat of discipline.

This leaves Throop's letter of direction and formal complaint to the chancellor, which defendants acknowledge are "arguably materially adverse actions." Dkt. 63, at 9-10. The court agrees: a formal letter of direction and a request for discipline could certainly dissuade an employee from filing a charge of discrimination or a federal lawsuit. Burton has identified a materially adverse action (or set of actions) on which to base a Title VII retaliation claim.

### 3.   Causal connection

For the final element of Burton's prima facie case, she must adduce evidence of a causal connection between her charge and later lawsuit and dean Throop's letter of direction and § 6.01 complaint. A plaintiff in a Title VII retaliation case must show that her protected activity was the "but for" cause of an adverse action, which "means that the adverse action would not have happened without the activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014).

Burton does not have direct evidence of Throop's motives and must therefore adduce circumstantial evidence of retaliatory animus. Circumstantial evidence can include suspicious

timing, ambiguous statements, similarly situated employees who were treated differently, pretextual reasons for the adverse employment action, "and other bits and pieces from which an inference of retaliatory intent might be drawn." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013). In this case, Burton relies on evidence of pretext: she contends that the allegations in Throop's letter of direction were so obviously false that they must have been a cover for retaliatory animus. Dkt. 57, at 29-30. The court disagrees.

Burton responded to the letter of direction by disputing Throop's factual assertions and accusing Throop of misconduct. *See generally* Dkt. 37-15, at 30-38. She takes the same approach in opposing defendants' motion for summary judgment, essentially inviting the court to determine whether Throop was right or wrong to write Burton the letter. But this is not the court's role in a Title VII case. Federal courts "do not evaluate whether the stated reason [for an adverse action] was inaccurate or unfair." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (citations and internal quotation marks omitted). Rather, courts look for evidence of pretext, which "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Id.* (citations and internal quotation marks omitted). Thus, the court's task here is to determine whether Burton has adduced evidence from which a reasonable jury could conclude that Throop did not sincerely believe the reasons that she gave for writing the letter of direction and pursuing further discipline.

Throop's letter of direction identified specific conduct or correspondence that, in Throop's opinion, demonstrated Burton's unprofessional behavior. Throop attached some of the pertinent correspondence to the § 6.01 complaint, and she also referred to the conduct outlined in the letter of direction. By and large, Burton did not dispute then (and does not

24

dispute now) that she wrote the emails that Throop described or that she took the actions that Throop identified. *See, e.g.*, Dkt. 37-12; Dkt. 37-14; Dkt. 37-15, at 8-29; Dkt. 54-11. What Burton wants to challenge is how Throop *perceived* and *characterized* those events, and whether Throop should have accepted Burton's explanations for each of them. But these are the types of internal business and personnel decisions which federal courts do not second guess, absent some evidence that the employer's decision was "completely unreasonable." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). Here, the record demonstrates that Throop had a factual basis for her conclusions. Burton's mere disagreement with Throop's decisions and with how Throop viewed Burton's conduct is not evidence of pretext.

The timing of Throop's letter of direction also undercuts an inference of retaliatory animus. Burton filed her first charge of discrimination in August 2013, and she filed this lawsuit against Throop in April 2014. This means that about six months passed between Burton's protected activity and Throop's October 2014 letter of direction. The gap itself is not dispositive because "a long time interval between protected activity and adverse employment action may weaken but does not conclusively bar an inference of retaliation." *Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014), *reh'g denied*, (Sept. 16, 2014). But, as defendants point out, Throop independently took actions that *benefited* Burton during the period between her first charge and the letter of direction. Specifically, Throop sought and obtained an equity adjustment to Burton's salary in March 2014. Such intervening beneficial treatment undermines a plaintiff's assertion of retaliatory animus. *See, e.g.*, *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 437 (7th Cir. 2002).

Burton cannot establish that Throop's letter of direction and later disciplinary complaint were a pretext for retaliation. Summary judgment is appropriate on Burton's Title VII claim of retaliation for filing charges of discrimination and this lawsuit.

## C. Conclusion

Burton's department, like almost any workplace, has its abrasive personalities, and the department produces its share of annoyances and disputes. Burton has found herself at the center of such conflicts over the past few years. But employers are entitled to manage, and even reprimand, their employees. Federal courts are not personnel departments, and federal retaliation law does not impose liability for every slight that an employee experiences. In this case, Burton has not adduced evidence from which a reasonable jury could find that defendants retaliated against her. Defendants are therefore entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Defendants Board of Regents of the University of Wisconsin System, Thomas Caywood, Elizabeth Throop, and Michael Dalecki's motion for summary judgment, Dkt. 32, is GRANTED.

2. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered March 17, 2016.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

26